Filed 10/17/14  P. v. Kiseloff CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MORRIE WILLIAM KISELOFF,<br><br>    Defendant and Appellant. | F066097<br><br>(Madera Super. Ct. No. MCR031544)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County.  Joseph A. Soldani, Judge.

William I. Parks, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Kari Ricci Mueller, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

### INTRODUCTION

Appellant/defendant Morrie William Kiseloff was tried for gross vehicular manslaughter while intoxicated with a prior conviction for driving under the influence

(Pen. Code, § 191.5, subds. (a), (d)), causing the death of his friend, Marvin Arthur Horne.  Defendant and Horne had spent the day together, going fishing and drinking, and driving in defendant's pickup truck.  As defendant performed a U-turn on Road 24, Horne either fell or "flew" out of the truck, landed on the pavement, and suffered fatal head injuries.

The disputed questions at trial concerned defendant's intoxication and how he was driving.  As we will explain below, the prosecution case was that defendant was under the influence; that he told the 911 operator that he was doing a "donut" when Horne flew out of the truck; that he told the investigating officer he had consumed 20 beers; and his drunk driving was the proximate cause of Horne's death.  The defense case was that defendant had been upset and confused when he spoke to the 911 operator and the investigating officer; that he misunderstood the officer's questions and thought he asked about Horne's alcohol consumption; that defendant only had two beers, was not intoxicated, and he was driving safely; that Horne was so drunk that he inexplicably opened the truck's passenger door and fell out; and that Horne's conduct was the intervening and superseding cause of his own death.

After a jury trial, defendant was found not guilty of the charged offense, but guilty of the lesser included offense of vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (b)).  He was sentenced to the upper term of four years.

On appeal, defendant contends the court committed prejudicial error when it permitted the prosecution to impeach his trial testimony with evidence that he had prior arrests for driving under the influence.  Defendant also contends the court committed instructional error because it declined to give his pinpoint instruction on Horne's intoxicated condition as a superseding, intervening cause of his own death, and instead gave a pattern instruction on causation that was allegedly confusing.  Defendant further argues the jury was not correctly instructed on the consideration of the other lesser

included offenses.  Finally, defendant asserts the court abused its discretion when it imposed the upper term.  We affirm.

## FACTS

On February 16, 2008, defendant and his friend, Marvin Arthur Horne, spent the day together.  They drove around to different fishing locations near Firebaugh.  Defendant drove them in his one-ton diesel Ford F-350 short cab pickup truck with dual rear axles.  The truck had two wheels on each side of the rear axle.  Defendant drove and Horne sat in the front passenger seat; the truck did not have a back seat.

At some time before 7:57 p.m., defendant pulled to the side of Road 24 so both men could relieve themselves.  They both returned to the truck and defendant started the engine and put his truck into gear.  As we have already mentioned, Horne either fell or was ejected from the passenger side of defendant's truck, and landed on the pavement of Road 24.  The disputed question at trial was how and why Horne fell out of the truck.

Defendant testified he immediately stopped his truck and ran to Horne's side.  Horne was lying on the pavement and apparently not responsive.  Defendant knew Horne was badly injured, but he did not have a cell phone to call for help.  An unidentified motorist stopped to help, but he did not have a cell phone either.  Defendant asked the other man to stay with Horne.  Defendant drove his truck to the nearest residence, which was at the corner of Road 24 and Avenue 7, and asked the homeowner to call 911 for help.  The woman called 911 and handed the telephone to defendant.

**The 911 call**

At approximately 7:57 p.m., defendant called 911 and told the operator:

"Ma'am, I--I--  My name is Morrie Kiseloff.  I'm right here.  I don't know what the address is.  *I went to do a donut, and my friend flew out of the truck, and he hit his head on the road.*  I need some help, please."[1]  (Italics added.)

---

[1] As we will explain below, one of the primary issues in this case involved how defendant was driving before Horne fell out of the truck.  The prosecution case heavily

3.

The operator told defendant to calm down and asked for his location. Defendant asked the homeowner, and she replied they were at Avenue 7 and Road 24. The operator again asked what happened and defendant said, "*He flew out of the door*," and "[h]e – he's on the road, he's bleeding to death." The operator told defendant to stay calm and emergency personnel were coming. (Italics added.)

After placing the call, defendant drove back to the scene. Horne was still lying on the road and the other motorist was there. Defendant parked his truck in the middle of the road and turned on his hazard lights to prevent anyone from driving over Horne.

**The scene**

George Mochizuki, a volunteer firefighter, received notice of the incident, and he was the first person to arrive at the scene.[2] California Highway Patrol Officer Peter Grotto arrived just after Mochizuki. Defendant's truck was parked in the middle of the road, and the headlights were on to illuminate the area.[3]

Marvin Arthur Horne was laying face-down across the center line on Road 24, directly in front of the truck and the headlights. Road 24 is a north/south roadway. Horne's head was towards the southeast and his feet were towards the northwest. He was groaning in pain.[4] Defendant was standing in the middle of the road, next to his truck's

relied on defendant's statement to the 911 operator that he was going to do a "donut" when Horne "flew" out of the truck. At trial, defendant testified he had been upset and confused when he spoke to the dispatcher, and insisted he performed a slow U-turn and did not attempt a "donut."

[2] The other motorist drove away when Mochizuki arrived, and defendant never got his name or contact information.

[3] Officer Grotto offered extensive testimony about the precise location of defendant's truck. When Grotto arrived, however, the truck was no longer in the same location as when Horne fell out of it since defendant had driven to the neighbor's house to call for help.

[4] Mochizuki believed Horne was lying across black tire skid marks that went across both lanes on the pavement. However, Officer Grotto testified that based on his examination of the scene, he did not see any skid marks on the pavement where Horne was laying.

passenger side.  (RT 1587-1588, 1886)  Defendant was very upset, and he was yelling at Grotto to help his friend.  (RT 1659)

Officer Grotto retrieved his EMT kit and tried to assist Horne.  Grotto asked defendant what happened.  Defendant was "yelling and screaming and very distraught about the whole situation," and "very concerned" about Horne.

Officer Grotto told defendant to calm down so he could help Horne.  Defendant stopped screaming and Grotto again asked what happened.  Defendant said "he made a U-turn and his friend fell out of the truck."

Officer Grotto and Mochizuki attempted to stabilize Horne.  However, the victim had major head trauma, and blood and fluid were emerging from his ears and head.  Horne moaned in pain for awhile, and then he was silent.  Horne was not able to say anything, and Grotto did not try to ask him any questions.

Officer Grotto continued to ask defendant about what happened as he treated Horne.  Defendant said they were friends, and they had been out the entire day together.  (RT 1590)  Grotto asked where they were coming from.  Defendant said they were coming from Firebaugh.  Defendant said he and his friend "had been drinking all day and were on a fishing trip."

The paramedics and additional backup units arrived, and Horne was taken to the hospital.

Horne suffered serious head injuries and remained hospitalized and in a coma until his death, which occurred on or about February 26, 2008.

**Defendant's additional statements at the scene**

After Horne was taken to the hospital, Officer Grotto remained at the scene and asked defendant additional questions about what happened.  Defendant said they had been at a bar in Firebaugh, which was 18 to 20 miles away.  After they left Firebaugh, defendant was driving to Horne's house to drop him off.  Defendant said he drove eastbound on Avenue 7 until they got to Road 24, and they decided they needed to go to

5.

the bathroom.  Defendant said he pulled off on the side of Road 24 and they both urinated and then returned to the truck.  Defendant said that he thought he heard Horne's front passenger door close when they got back into the truck.

Officer Grotto asked defendant how Horne fell from the vehicle.  Defendant said the truck had been facing south.  He accelerated and made a U-turn to drive north, and Horne fell out of the truck.

Officer Grotto testified that during this conversation, he noticed objective symptoms that defendant was intoxicated with alcohol.  Defendant's eyes were red and watery, his speech was slurred, and he smelled of the distinct odor of alcohol.[5]

**The field sobriety tests**

After making these observations, Officer Grotto asked defendant a series of questions about what he was doing earlier that day, what happened before the collision, the condition of his truck, whether he had eaten anything, and his health and medical condition.  Defendant said he had a sandwich earlier that day, there was nothing mechanically wrong with his truck, he was not sick or injured, and he was not epileptic.  Defendant said he was diabetic but he did not use insulin.  Defendant said he had bad knees.  Defendant said he had slept eight hours the previous night.

Officer Grotto asked defendant if he had any alcohol to drink after the accident happened.  Defendant said no.  Grotto asked if he had a head injury, and defendant said no.

While they were still at the scene, Officer Grotto administered a series of field sobriety tests (FSTs) to defendant.  These tests were the horizontal gaze nystagmus test (HGN), the Rhomberg balance test, the finger count test, and the hand-pat test.  Defendant's reactions and responses to all the tests were consistent with being impaired

---

[5] Officer Grotto testified defendant was a very large person.  Defendant's driver's license stated he was six feet six inches tall and weighed 360 pounds.  At trial, defendant testified Horne was "about the same size" as he was.

6.

by alcohol. Grotto asked him to stand on one leg, but defendant said he could not because of preexisting knee injuries.

**Defendant's statements about drinking**

As explained above, Officer Grotto initially asked defendant what happened as he was trying to render aid to Horne. Defendant said he and his friend "had been drinking all day and were on a fishing trip."

Officer Grotto testified that he asked defendant "what he had drank that day."

"Q     And it's your testimony that [defendant] told you that he had drank 20 beers during the day and approximately 12 of them between 4:00 and 7:00 P.M.?

"A     Yes, exactly right."

Officer Grotto testified defendant said he drank the 12 beers "at the bar in Firebaugh." Grotto testified this exchange occurred about five to 10 minutes after defendant had calmed down, and defendant was no longer distraught.

Officer Grotto testified that in his experience of DUI investigations, no one had ever claimed to have consumed 20 beers.

"Q     Is there any possibility that [defendant] thought you were asking what his friend had drank that day?

"A     No. I asked him what he had drank that day."

As a result of the collision, defendant's statements, the FSTs and defendant's objective symptoms of intoxication, Officer Grotto arrested defendant at the scene for driving under the influence of alcohol.

**The EPAS test**

After being arrested, Officer Grotto transported defendant to the Madera County Jail, and advised him about the options to perform a chemical test. Defendant said he would perform a breath test. The drive from the scene to the jail took about 10 to 12 minutes. Defendant repeatedly expressed his concern about Horne.

7.

They arrived at the jail around 9:00 p.m. Officer Grotto administered the breath test using the electronic preliminary alcohol screening (EPAS) machine. Defendant did not have anything to eat or drink, he did not smoke, and he did not vomit between his arrest and the administration of the test.

Defendant blew into the EPAS machine on two separate occasions. According to the EPAS reading, defendant had a blood-alcohol level of 0.08 percent at 9:13 p.m., and the same reading at 9:17 p.m. The machine's error factor was 0.01.

**Further investigation of the scene**

Officer Grotto had training and experience in accident investigation. He prepared a diagram of the scene, based on measurements taken on the night of the incident and the following day.

The incident occurred on Road 24, a two-lane north-south roadway. Each lane was approximately 10 feet wide. The roadway was one of the older ones in the county, and "not as smooth as a driver would like if you're driving on it." There were dirt shoulders on both the east and west sides of Road 24. On the west side of Road 24, there was a newly-planted orchard, and power poles were on the dirt shoulder.

Officer Grotto testified there were tire marks which began on the edge of the west side of Road 24, north of where Horne was lying on the road. The tire marks proceeded to the west side of Road 24, and then back to the southeast, and then reentered the road just to the north of where Horne was laying. There was no indication the truck swerved or accelerated when it initially left the road. There were no tire tracks in the dirt on the east side of Road 24.

Officer Grotto testified the tire marks were very smooth up to a certain point as they turned to the southeast, and "there they were more distinctive because I noted there was dirt that was kicked up to the southwest … toward the orchard, away from the direction of the turn." The dirt was kicked up in a southwesterly direction about six or eight inches from the tire mark.

Officer Grotto testified there were clean tire marks, and then marks where the dirt had been displaced. Grotto explained that dirt displaces when a vehicle is "moving at a fast speed and the wheels are turned or the wheels [are] spinning" or "losing traction and spinning at a fast rate than the vehicle is actually moving." Grotto testified the tire marks were similar to those made by his own patrol car "when making abrupt U-turns to go catch a person who's speeding." He believed these were acceleration marks.

Officer Grotto testified the term "donut" was a vehicle maneuver when a person turns "either all the way or very far to one direction either left or right, and stepping on the accelerator where the tires are spinning. The vehicle is turning around in a quick motion." "[Y]ou accelerate and turn abruptly to one direction or the other. You accelerate your tires so that they lose traction and basically the rear of your vehicle spins around. I don't necessarily think it has to be a complete circular donut in order to spin your car around like that." Grotto had performed such a turn before in his patrol car, and explained "[w]hat's required is an abrupt turn in either direction. And acceleration where the tires lose traction."

Officer Grotto testified the displaced dirt and the location of Horne's body were consistent with defendant's statement that he made a U-turn and Horne fell out of the truck. It was not illegal to perform a U-turn on that part of Road 24.

Officer Grotto testified that when he arrived at the scene that night, defendant's truck was parked in the middle of Road 24, with the front end facing south. Based on defendant's statements about what happened, Grotto believed the truck was in the same location where defendant had stopped it immediately after the incident. However, the truck's location in the middle of the road was inconsistent with the tire tracks in the dirt. Grotto determined defendant had made another turn to "redirect his vehicle in a southern

9.

direction" on the paved road.[6]  Grotto did not find any tire or skid marks on the actual pavement of the road.  He did not believe the truck crossed to the east side of Road 24.

Officer Grotto never compared the tire tracks in the dirt with the tread on defendant's truck.  However, defendant's truck had two tires on both sides of the rear axle.  Grotto testified the tire tracks in the dirt were made by defendant's truck "based on his statement, based on his vehicle [and] the dually tires on his vehicle, which were evident in this location as well.  These were dually tire tracks.  The tire marks in this area that had the dirt kicked up from them were dual tire tracks.  And based on the evidence at the scene and the statements that [defendant] told me when I spoke to him at the scene, that's how I determined that."

Mochizuki and Officer Grotto separately arrived at the scene, and they drove around defendant's truck to avoid hitting the victim on the road.  Grotto testified the tracks in the dirt were not from their vehicles but from defendant's truck because they were "dually tire tracks."

Officer Grotto visually examined the truck's seatbelts, and buckled and unbuckled them, and determined they were working properly.  He also determined the front passenger door worked properly.

Officer Grotto testified that defendant attempted to perform a U-turn but he did not believe defendant completed it.  Grotto concluded Horne could have fallen out of the truck especially if Horne was inebriated.

**Defendant's level of intoxication**

Ricardo Deslate, a senior criminalist with the Department of Justice, testified as a prosecution expert in forensic alcohol analysis and alcohol impairment.  Deslate testified

---

[6] As explained above, defendant testified at trial that he moved his truck after Horne fell out because he had to drive to a nearby house to call for help.  When he returned to the scene, he parked the truck in the middle of the road so no one would drive over Horne's body.  It is not clear if Officer Grotto was aware of that fact when he was investigating the tire tracks at the scene.

10.

the EPAS machine tests the amount of alcohol in a person's breath sample. It does not test the blood-alcohol concentration.

Deslate reviewed the records from the EPAS machine and testified it was properly calibrated when defendant was tested, and it had an error rate of 0.01 percent.

Deslate testified that based on defendant's results of 0.08 percent, he was impaired and it would not have been safe for him to operate a vehicle. However, the EPAS machine only determined the amount of alcohol in his system at the time of the test and not when he would have been driving.

The prosecutor asked a hypothetical question where an individual consumed 12 beers between 4:00 p.m. and 7:00 p.m., and recorded two breath test results of 0.08 percent at 9:00 p.m. Deslate testified that if the last beer was consumed at 7:00 p.m., then all the alcohol would have been fully absorbed into the person's body by 8:00 p.m. Deslate testified to his opinion that the individual's blood-alcohol concentration would have been 0.10 percent at 8:00 p.m., because the average burn-off rate was 0.02 percent per hour. A person of defendant's similar height and weight (six feet six inches tall and 360 pounds) would have to consume at least eight to eight and one-half alcohol beverages to record a blood-alcohol level of 0.08 percent.

In response to another hypothetical question, Deslate testified that if a person consumed his last drink at 7:00 p.m., drove at 7:45 p.m., and gave breath alcohol samples at 9:15 p.m., the person's blood-alcohol level would have been 0.11 percent at the time he was driving.

**The pathologist's testimony**

Dr. Robert Lawrence, a pathologist with the Madera County Coroner's Office, performed the autopsy on Horne on February 28, 2008. Horne suffered brain death due to skull fractures from blunt trauma to the head.

Dr. Lawrence testified Horne had fractures to both sides of the skull, which originated at the right rear of his head, and caused bruising and hemorrhaging in the

11.

brain, and ultimately brain death. There was a thick bruise on the right rear scalp, where his head hit the concrete road. The injuries from the impact were from falling onto the right rear side of his head.

Dr. Lawrence testified the force required to cause Horne's brain injuries was roughly similar to falling out of a one- or two-story building and landing on the back of the head. Horne's head and brain injuries were consistent with someone performing a U-turn, and Horne falling out of a pickup truck and landing on his head. There was no evidence he had been run over by a vehicle. Horne was definitely alive when he fell out of the vehicle.

Dr. Lawrence testified Horne's blood was taken when he was admitted to the hospital, and tested at 9:15 p.m. The toxicology tests showed Horne's blood-alcohol level was 0.206 percent, which was over twice the legal limit. A person's motor skills would be grossly impaired at that level, and he would be staggering and have slurred speech. Horne also tested positive for Benzodiazepine (BDZ), a mild tranquilizer similar to Valium, which would accentuate the effect of alcohol. It was possible the drug was administered after he was admitted to the hospital. He also tested positive for marijuana in his system, but he could have used it several days before the collision.

Dr. Lawrence testified Horne was impaired but he did not know whether that impairment contributed to the accident. The toxicology results did not change his opinion on Horne's cause of death.

### DEFENSE EVIDENCE

The defense presented several experts to refute Officer Grotto's investigation at the scene about how defendant was driving, and the prosecution's claim that defendant was intoxicated.

### Defense investigators and the scene

Robert Gonzales, the defense investigator, worked with defendant to create a video reenactment of the incident. It was filmed exactly one year after the incident, on

12.

the same road and at the same time of day, using the same truck. Gonzales filmed it based on defendant's recollection of what happened that evening. Defendant told Gonzales that he was going five to seven miles per hour as he performed the U-turn. The truck's dome light worked, and the dashboard beeped if the door opened or the seat belt was not fastened. The video was played for the jury.

Stanley Dorrance testified as the defense's criminalist and forensic consultant. He reviewed the reports about the FSTs which Officer Grotto administered to defendant at the scene. Dorrance testified there were deficiencies in how Grotto administered and documented the FSTs, and the tests were given a substantial time after defendant had been driving. Dorrance conceded his opinion was based on Grotto's report, and he had not heard or reviewed the extensive testimony Grotto had just given during the trial. Dorrance further testified defendant's reactions to these tests only meant that he had alcohol in his system, and not that he was intoxicated. Dorrance testified that based on the results of the breath tests, he could not determine defendant's blood-alcohol level at the time of the collision, or whether it was rising or falling, since he did not know defendant's drinking pattern and the police did not conduct multiple alcohol screening tests. The machine's error rate was plus or minus 0.01 percent, so defendant's level could have been under 0.08 percent.

Dorrance believed that it would be unsafe for anyone to drive with a blood-alcohol level of 0.10 percent. On cross-examination, in response to the prosecutor's hypothetical question, Dorrance testified a man who weighed 360 pounds would have to consume eight to 15 drinks to reach a 0.10 percent blood-alcohol. If such a person drank 12 beers between 4:00 p.m. and 7:00 p.m., drove a vehicle at 7:54 p.m., and had a 0.08 percent blood-alcohol at 9:13 p.m., he would have a blood-alcohol level of 0.14 percent at 7:50 p.m.

Dorrance testified a person with a 0.206 percent blood-alcohol level (Horne's results) would be grossly impaired, with clearly diminished mental capacities and thought

13.

processes. He would be a danger to himself depending on the circumstances. The person's impairment would likely be readily apparent to others. The person would have trouble getting in and out of a large, high truck, and buckling and unbuckling a seat belt.

**Defendant's truck**

Keith Dungan, a friend of defendant, testified defendant's truck was "not real fast," and it could not "burn rubber." The truck was slow but had "a lot of torque" because it was made for pulling and hauling. Dungan had been in defendant's truck on several occasions. He noticed the passenger-side seatbelt would "cinch up" and lock. It would be too tight across his body, and it could not be adjusted. He had to unlatch the belt to adjust and loosen it. The seatbelt did not properly retract, and he had to open the passenger door to pull up the belt. Dungan never told defendant about these problems when they occurred. However, Dungan admitted he told defendant about the seatbelts after Horne's death, about a year before the trial.

George Ripsom, a forensic scientist, testified as a traffic collision expert. He reviewed the reports prepared by Officer Grotto, Deslate, the pathologist, and the defense investigator. He testified a complete reconstruction could not be performed because Grotto failed to properly document the scene.

Ripsom described defendant's truck as a big, heavy duty vehicle but very slow. Based on the size of the truck and dimensions of Road 24, defendant had a minimum turning radius from one dirt shoulder to the other side. If he went faster, the U-turn would have been wider.

Based on the size of defendant's truck and the tire marks in the dirt, as noted in Grotto's report, Ripsom believed defendant had stopped the truck when Horne fell out of the vehicle. Ripsom believed the driver was "pretty astute in determining that something was occurring and responding to it and stopping. Probably as soon as the truck hit the cement he realized there was a problem."

14.

Ripsom described a "donut" as when the vehicle's "front end stays virtually stationary and the rear end of the vehicle spins around it. [¶] … [¶] What you have to do is get the rear tires spinning or accelerating at a high enough speed that they create, basically, little rubber balls that get[] rubbed off of the tires and get underneath the tire acting like little ball bearings and allow the tire actually to slide sideways which allows the rear-end … of the truck to spin around the front end."

Ripsom testified that if defendant had been performing a "donut" when Horne fell out, defendant would have run over Horne's body. Ripsom was unable to determine the speed of defendant's truck at the time of the actual incident, and blamed that on deficiencies in Grotto's report.

**Defendant's blood-alcohol level**

Ripsom concluded defendant was driving his truck as a normally prudent driver would do when the incident occurred. Ripsom criticized the breath tests and testified the two tests should have been 30 minutes apart to determine if defendant's alcohol levels were rising or falling. Ripsom believed defendant's blood-alcohol was "probably" rising when he provided his breath sample. If so, then defendant "probably" had no alcohol in his blood.

On cross-examination, however, Ripsom conceded he never heard defendant's 911 call or read the transcript. He did not know that defendant told the 911 operator that he intended to do a donut and his friend flew out of the truck. Defendant's statements to the operator did not figure into Ripsom's opinion about what happened. Ripsom testified there was no evidence defendant's attempted U-turn was a donut because the front end of the truck would have been "virtually in place, virtually stationary. And the rear-end spinning around it in order to do that the rear tires have to be spinning at a very high speed." If defendant had performed a donut and Horne fell out of the truck, defendant would have run over Horne because he could not have stopped the truck's movement.

15.

Also on cross-examination, the prosecutor posed a hypothetical question where a person consumed 12 beers between 4:00 p.m. and 7:00 a.m., drove at 7:50 p.m., and recorded a 0.08 percent blood-alcohol level at 9:13 p.m. and 9:17 p.m. Ripsom testified that a very large person would have had a 0.20 percent blood-alcohol at 7:50 p.m. Ripsom explained that a person at 0.08 percent would slur his words, at 0.20 percent the person would have difficulty responding to questions, and at 0.30 percent the person would be unconscious in the hospital.

Clifford Romano, a civil engineer and accidental reconstruction expert, criticized Officer Grotto's preparation of the report, testified it contained minor inaccuracies, and it was somewhat confusing. However, Romano was able to use the data from the report, and testified the maximum possible speed of defendant's truck as it made the U-turn was 12 miles per hour. Romano testified that there was no evidence the truck accelerated in a quick manner, and no evidence of negligence.

## DEFENDANT'S TRIAL TESTIMONY

Defendant lived in Kerman. Horne had been his friend since high school. On the day of the incident, defendant picked up Horne around 11:30 a.m. so they could go fishing. Defendant testified his "dually" pickup truck was not fast, and it was "made to pull trailers not to go out and haul ass."

On direct examination, defendant testified he was aware of the problems with the passenger-side seatbelt described by Keith Dungan. The seatbelt would tighten and lock when buckled, and it could not be adjusted. The passenger had to unlock it, "let it engage all the way back in and then pull it back out to go ahead and make it work again." It happened "probably 35, 40 percent of the time." On cross-examination, however, defendant conceded that "before this happened I didn't know that we had a flaw in the seatbelt." Defendant clarified he didn't talk to Dungan about the seatbelts, and he did not know about the problem until after Horne died.

16.

## The fishing trip

Defendant testified he drove to Firebaugh so they could go fishing in the canals. On their way, they stopped at a liquor store and Horne bought a 12-pack of beer. Defendant testified he was not feeling well, and he drank Nyquil during the day for his illness. He did not plan to drink alcohol and bought two Cokes for himself.

Defendant drove to a canal south of Firebaugh and they went fishing. Defendant did not drink any beer, but Horne had at least four beers. After fishing for about one hour, they drove to a different location on the canal. On the way, they stopped at another liquor store and Horne bought another 12-pack of beer. Defendant testified Horne was drinking pretty fast and he did not want to run out of beer. Based on their prior experiences together, defendant knew that Horne could hold a lot of liquor.

At the second fishing spot, Horne finished the first 12-pack of beer and started drinking from the second 12-pack. Defendant drank the sodas and did not consume any beer. They did not eat anything.

Defendant testified they fished at the second spot for two or three hours, and then he drove to a third location. Horne continued to drink beer, and defendant did not have anything. Horne seemed normal "because all the time I seen him he was always drunk."

Defendant testified Horne drank all 24 beers while they fished that day. Defendant drank soda and four ounces of Nyquil during the same time. Defendant insisted he did not drink any alcohol while they fished.

## Dinner and the bar in Firebaugh

Sometime between 5:30 p.m. and 6:30 p.m., they finished fishing and defendant drove to a restaurant in Firebaugh so they could eat dinner. Defendant had four tacos and one burrito, and drank his first beer of the day. Horne ate a couple of tacos and drank two or three more beers. They stayed at the restaurant for about one hour.

When they left the restaurant, defendant got into the driver's seat, and Horne got into passenger side of the truck. Horne put on his seatbelt and closed the door.

17.

Defendant started to drive but realized he had to use the restroom. Defendant stopped at a bar in Firebaugh and they both went inside. Defendant bought a beer so he could use the bar's restroom. Horne drank whiskey. Defendant testified he ordered a second beer, but he only drank about a quarter of it before they left.

Defendant testified they got into the truck. Horne did not have any trouble getting into the truck. Defendant was driving, and Horne sat in the front passenger seat. Horne closed the passenger door and buckled his seatbelt. Defendant backed out of the parking lot, got onto Highway 33, and headed back to Kerman on Avenue 7. The radio was on and they talked about their day.

Defendant testified he was "a hundred percent alert" even though he had a few drinks and drank Nyquil during the day. He did not feel sleepy from the beer or the Nyquil.

### Defendant stops on the side of Road 24

Defendant testified that as he approached Road 24, Horne said he had to urinate. Defendant also needed to relieve himself. Defendant turned south on Road 24 and then pulled onto the shoulder and parked on the west side of the road, next to the newly-planted orchard. Defendant and Horne got out of the truck and relieved themselves.

### Defendant and Horne get back into the truck

Defendant got back into the driver's seat and buckled his seatbelt. Defendant testified Horne returned to the passenger side. Defendant saw Horne buckle his seatbelt, he saw and heard Horne close the passenger door, and the truck's dome light went off.

Defendant started the truck, asked Horne if he was ready, and Horne said yes. He did not see or sense any problems with Horne, even though Horne had been drinking all day. "I seen him before the same way, he took care of his self [*sic*]."

Defendant put the truck in gear and started to make a U-turn. There were no other cars on the road. Defendant testified he did not accelerate, he did not spin the back tires, and he did "a normal fashion U-turn." He believed he was going about seven miles per

hour, based on the reenactment. Defendant did not have any trouble driving or controlling the truck.

Defendant testified he never completed the U-turn, and never reached the east shoulder of Road 24 to face north. The next thing he remembered was "the bell went off and the light came on. I went and looked over and [Horne] was falling out of the truck." Defendant testified Horne was already in the motion of falling out of the truck when he noticed what was happening. The truck's dome light went on and the dashboard bell started to ring to indicate the seatbelt was not latched. This happened when he started making the U-turn, and "[b]y the time I looked back over he was falling out of the truck," and the passenger door was open. Defendant did not hear any noises consistent with Horne opening the door and/or unbuckling the seatbelt.

Defendant immediately hit the brakes, stopped the truck, and put it in neutral. The truck's rear tires were still on the dirt shoulder. Defendant ran to Horne, who was lying on the road and moaning. Defendant tried to talk to Horne and waited a few minutes to see if he could shake it off. Defendant saw blood from the back of Horne's head.

**Defendant calls 911**

Defendant testified about how he left Horne with another motorist and drove the nearest house to call 911. The homeowner dialed 911 and handed the telephone to defendant; the homeowner told the operator where they were.

On direct examination, defendant was asked why he used the word "donut" when he described the accident to the 911 operator. Defendant testified he did not mean that he was spinning around the truck. He meant to say he was doing a U-turn. "… I was in such in distress that I, you know, I would tell anybody as long as I could get some help to where I was."

## Officer Grotto arrives

Defendant testified he was very upset and emotional when Officer Grotto arrived. He was yelling and screaming for help. The ambulance arrived and they took Horne to the hospital.

Defendant testified that Officer Grotto asked him what happened. Defendant replied he was making a U-turn and Horne fell out of the truck. Defendant testified Grotto asked him about "any alcohol consumption by anyone that given night." Defendant testified he was confused by Grotto's questions. Defendant admitted he told Grotto he drank 20 beers that day, and he had at least 12 beers between 4:00 p.m. and 7:00 p.m. However, defendant explained his statement was incorrect and he only had two beers that day. Defendant testified he made this statement to Grotto because he thought Grotto asked him about how much alcohol *Horne* consumed that day.

## Cross-examination

On cross-examination, defendant testified that when he called 911, he was trying to get help as soon as possible, he was distressed, and he was talking about the U-turn when he used the word "donut." While he told the operator that Horne "flew" out of the car, he meant to say that Horne fell out of the truck.

Defendant testified he tried to answer Officer Grotto's questions truthfully, but he was "in shock" and could not remember Grotto's questions or his answers at the scene.

Defendant was asked why he failed to tell Officer Grotto that the dome light came on and the seatbelt buzzer sounded when Horne fell out of the truck. Defendant testified he did not give these details to Grotto because he "didn't ask me none of those questions. He just asked me what happened and that was it .…"

Defendant claimed he did not realize Officer Grotto was investigating him for driving under the influence in this case until he was taken to the police station.[7] On

---

[7] As we will discuss in issue I, *post*, the court initially excluded any evidence of defendant's prior DUI cases. After defendant's direct examination testimony, however,

further cross-examination, however, defendant admitted he had been through two prior investigations for driving under the influence. Defendant testified he was investigated for DUI in 1991, but claimed he could not remember whether an officer asked him how much alcohol he consumed at that time because it was "so long ago." Defendant was also investigated for driving under the influence in 1996. Defendant claimed that during both the 1991 and 1996 incidents, the officers did not ask any pre-field sobriety test questions about his medical and physical conditions.

Also on cross-examination, defendant was asked if he was arrested as a result of the 1991 and 1996 investigations. Defendant replied: "I had to have. You said you got it on the record." Defendant insisted that even though he went through two prior DUI investigations, he did not realize Officer Grotto was investigating him for DUI at the scene, and did not understand until he was at the police station.

## DISCUSSION

### I.    Defendant's prior DUI arrests

Defendant contends the court erroneously permitted the prosecutor to impeach his trial testimony with evidence of his prior DUI cases. Defendant argues the evidence was not relevant for any purpose and was highly prejudicial. As we will explain, however, the court initially excluded this evidence during pretrial motions. During the course of defendant's testimony, the court granted the prosecutor's motion for reconsideration in light of defendant's claim that he did not realize he was being investigated for DUI and that Officer Grotto asked about his own alcohol consumption at the collision scene. In light of defendant's testimony, the court properly reconsidered the prosecutor's motion and admitted the evidence.

_____

the court reconsidered its ruling and decided to allow the prosecution to impeach defendant with the prior DUI cases because of defendant's testimony that he did not realize Grotto was conducting a DUI investigation at the collision scene. On appeal, defendant contends the court's reconsidered ruling was erroneous and prejudicial.

21.

## A.  The court's pretrial ruling.

During the pretrial motions, the prosecutor moved to introduce evidence of defendant's prior arrests and convictions for DUI.  The prosecution's motion stated that on July 17, 1996, defendant was convicted of driving with a blood-alcohol level of 0.08 percent or higher, and admitted two prior convictions.  On October 9, 1991, defendant was stopped for speeding, officers believed he was intoxicated, they asked him how much he had been drinking, defendant said he had too much vodka and beer, and he was arrested for driving under the influence.  On March 8, 1996, defendant was stopped for traffic violations, he appeared intoxicated, an officer asked defendant about whether and how much he had been drinking, and defendant said, "I'm guilty.  If you guys didn't catch me now, you would catch me later."  Defendant was arrested for driving under the influence.

At the hearing on the motion, the prosecutor presented documents about defendant's prior DUI convictions.  On February 21, 1992, he had a juvenile adjudication for driving under the influence (Veh. Code, § 23152, subd. (b)).  On December 8, 1992, he had a conviction for a "wet reckless," meaning reckless driving with the consumption of alcohol (Veh. Code, §§ 23103, 23103.5).[8]  On March 9, 1996, he was arrested and on July 17, 1996, he pleaded guilty to misdemeanor driving under the influence with two prior convictions (Veh. Code, § 23152, subd. (b)).

The prosecutor argued the evidence was not being admitted as propensity evidence, but it was relevant and probative to establish his gross negligence as an element of the charged offense because of his prior knowledge of the dangers of drunk driving.

_____

[8] A "wet/reckless" is reckless driving with the consumption of alcohol, which may result in additional punishment if the offender has prior DUI convictions.  (See, e.g., *People v. Forrester* (2007) 156 Cal.App.4th 1021, 1023, fn. 2; *Walker v. Kiousis* (2001) 93 Cal.App.4th 1432, 1437; *Nakamura v. Superior Court* (2000) 83 Cal.App.4th 825, 830.)

Defense counsel moved to exclude all evidence of defendant's prior DUI convictions because the last offense occurred in 1996, the offenses were too remote, and the evidence was highly prejudicial and would inflame the jury.[9]

The court's initial decision was that the evidence was relevant to establish defendant's heightened knowledge and awareness of the dangers of driving under the influence. After further review, however, the court decided to exclude the prior DUI convictions. The court held the evidence was prejudicial pursuant to Evidence Code section 352 because the prior offenses were remote and there was the risk the jury would rely on the evidence to show defendant's propensity to drive under the influence of alcohol.

## B. **Defendant's trial testimony**

As set forth above, Officer Grotto testified defendant said they had been drinking all day. Defendant also said he had consumed 20 beers.

On direct examination, defendant testified he was confused by Officer Grotto's questions that night. Defendant admitted he told Grotto he drank 20 beers that day, and at least 12 beers between 4:00 p.m. and 7:00 p.m. Defendant claimed his statement was not correct because he only had two beers that day. Defendant also claimed that he thought Grotto asked him about how much alcohol *Horne* had been drinking.

On cross-examination, defendant insisted that when Officer Grotto asked about alcohol consumption, he thought Grotto wanted to know how many beers Horne drank, and that is why he said 20 beers. However, defendant admitted that he understood Grotto's other questions were about his own condition, such as whether he was diabetic or had anything to eat that night. On further cross-examination about Grotto's questions,

---

[9] According to the probation report, defendant was convicted in 1995 of a misdemeanor violation of Vehicle Code section 14601.2, subdivision (a) and placed on probation. In 1996, he was convicted of misdemeanor violations of Vehicle Code sections 23152, subdivision (b) and section 14601.2, subdivision (a) and placed on probation.

defendant testified that he "can't even recall that night," including anything about Grotto's questions and his answers.

> "[The prosecutor]: *Are you saying that you didn't know you were being investigated for driving under the influence at that time?*
>
> "A *I did not know.*
>
> "Q When the officer asked you those questions; if you're sick, injured, diabetic, if there's anything mechanically wrong with the vehicle, what did you think was going on at that point? [¶] … [¶]
>
> "[A]: Didn't know.
>
> "Q And when the officer had you do the horizontal gaze nystagmus test, when you were to follow the stimulus and he watched your eyes, what did you think was going on?
>
> "A I wasn't going to pass.
>
> "Q I'm sorry?
>
> "A I wasn't going to pass.
>
> "Q Why do you say that?
>
> "A I was so excited and so nervous and so up rah [*sic*], I mean ….
>
> "Q So you're saying you didn't think you were going to pass, does that mean you knew what was going on, that you were being investigated at that point?
>
> "A No, the officer said do you want to take the test or do you want to go ahead and go to the station and take a blow. I said, we'll go to the station and blow.
>
> "Q But at some point you did perform the horizontal gaze nystagmus test, the officer watched your eyes, you followed the stimulus?
>
> "A At the … I had to, yeah.
>
> "Q When did you realize that Officer Grotto was investigating you for driving under the influence?
>
> "A After he took me to the … police station.

"Q    Is that after you're arrested?

"A    He – he told me that he was going to go ahead and contain me until I got over there.  And … if I blew under a .08 he was going to take me back to my truck.  [¶] … [¶]

"Q    *At any point prior to your arrest did you realize that that drinking question was about you and not about* [*Horne*]?

"A    *No, I did not*."  (Italics added.)

## C. <u>**The prosecution's motion for reconsideration**</u>

Immediately after this testimony, the court excused the jury and the prosecutor moved for the court to reconsider whether it would admit evidence of defendant's prior arrests and convictions for DUI.  The prosecutor argued defendant had opened the door to the DUI evidence based on his claim that he did not know he was being investigated for DUI until he was taken to the police station.  The jury needed to know about defendant's experience and history with DUI investigations in order to evaluate the truthfulness of his claims.  Defendant had been investigated and arrested three times for DUI, and the police reports from those incidents indicated he had been asked very similar questions.  The prosecutor argued:  "[I]t's a pretty formulaic investigation and so I think his assertion that he was confused about this, didn't have any idea what was going on until he was arrest … the jury can't fairly evaluate that statement without knowing … more about his history."

The prosecutor argued that defendant opened the door to this evidence based on his testimony that he had "no idea how much he can drink and safely drive … because he has been arrested for and convicted of [DUI] on three prior occasions."  The prosecutor argued this evidence was relevant and probative, particularly given defendant's claim that he was confused during the investigation.  "He's denying the drinking pattern in order to prove that he's not under the influence.  And in order to do that he has to tell this story that he's confused up until the last minute."

Defense counsel argued defendant had explained his confusion that night.  He mistakenly said he drank 20 beers because he was in shock and thought Officer Grotto

was asking about Horne. Defendant's responses did not open the door to the prior DUI evidence because the convictions were remote. In addition, defendant was not required to know the pattern of questions asked in a DUI investigation.

The prosecutor replied:

"It's more than just one question where we ask about the drinking pattern. Did you tell the officer this and he says no. It's more than that one question because to make that story credible the defendant has gone on to testify that he was confused the entire [time], that he never realized his mistake. Because in trying to flush out the story, I asked about, you know, did you ever realize this is a DUI investigation to ask the follow-up question why didn't you correct the officer? Why didn't you – *but he testified he never realized that this was a DUI investigation and that's what he's got to say to make this a credible story*. And I think that's the part that brings in the priors, his testimony that he had no idea what was going on until he was in the station." (Italics added.)

### D. **The court's ruling**

The court granted the prosecution's motion and held the prior DUI evidence was admissible to impeach defendant because of his trial testimony.

"I do believe it is appropriate for impeachment purposes regarding the testimony of the defendant *to ask him about whether or not he has been through this process before*. [T]he Court's not going to allow anyone to talk about the prior convictions, *but you can talk about the prior investigations that he's been involved in if, in fact, those same questions were asked*. The defendant is testifying that he didn't understand this was a DUI investigation and that's why he may have misunderstood the question. I think it goes to his credibility and his impeachment if, in fact, he's been through this process several times before. And these same questions and other things were asked as a result of those questions he was arrested for driving under the influence. So I will allow that.

"I will not allow the discussion regarding the amount of alcohol that he had on those two occasions or three occasions, whatever it was. We're not – we're not going to go there. I don't think that is relevant to tie down the number of drinks, et cetera, how much he can consume and safely drive. So that's what I'll allow you a limited ability to go into that area regarding his prior investigations that he was the target of. And you indicated that you have records of two. You're also indicating that those same questions

26.

were asked about how much he had to drink, et cetera. I'll allow that but not beyond that." (Italics added.)

Defense counsel argued the evidence was prejudicial under Evidence Code section 352 because he would have to "bring in officers from the prior convictions and everything else." The court said the evidence was highly relevant and probative to defendant's veracity about whether he realized Officer Grotto was asking how much he had to drink, and investigating him for driving under the influence. "I think he has opened the door in testifying in that fashion."

The prosecutor said two of the officers from the prior investigations had been under subpoena but they were released prior to trial, when the court initially excluded this evidence. The court directed the prosecutor to continue with cross-examination, and advised defense counsel he could make further motions after the conclusion of defendant's testimony.

### E. Defendant's continued testimony

When the prosecutor resumed cross-examination, he asked defendant whether he knew about the routine of a DUI investigation. Defendant said yes. The prosecutor asked if he was pulled over for a DUI in 1991, and whether the officer asked if he was diabetic, bumped his head, and how much he had to drink.[10] Defendant initially said no, then said he was probably asked those questions, and explained "it was so long ago, I don't know."

The prosecutor asked defendant if he was pulled over and investigated for DUI in 1996. Defendant said yes. The prosecutor asked whether the officer asked if he was diabetic, whether he had slept, how much he ate, if he had a head injury, and how much he had to drink. Defendant said he did not know if he was asked those questions.

---

[10] Defense counsel repeatedly objected to the prosecutor's questions, and the court acknowledged defendant's continuing objections.

27.

"Q All right. *So in both of those cases you were at the conclusion of those investigations arrested for DUI, correct*?

"A *I had to have. You said you got it on the record.* [¶] … [¶]

"Q Even with those prior experiences, being investigated for driving under the influence, is your testimony here today that in February of 2008, you had no idea you were being investigated for DUI until you were taken to the station?

"A Correct." (Italics added.)

On redirect examination, defense counsel asked defendant about his conversation with Officer Grotto at the scene. Defendant testified that Grotto said they were going to go to the jail so he could blow into the machine, and if it came back at 0.08 percent, Grotto would drive defendant back to his truck. Defendant again testified that when Grotto asked him about alcohol consumption, he thought Grotto was asking about how much Horne had been drinking.

At the conclusion of defendant's testimony, defense counsel did not make further objections or request to call the investigating officers. Defense counsel did not ask for a limiting instruction on the jury's consideration of defendant's testimony about the prior DUI cases.

## F. Analysis

A defendant who takes the stand places his or her own credibility in issue, and is subject to impeachment in the same manner as any other witness. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1139.) Evidence tending to contradict any part of a witness's testimony is relevant for purposes of impeachment. (Evid.Code, § 780, subd. (i); *People v. Lang* (1989) 49 Cal.3d 991, 1017.)

A trial court may admit otherwise inadmissible evidence for impeachment purposes to prove or disprove the existence or nonexistence of a fact about which a witness has testified or opened the door. (*Andrews v. City and County of San Francisco* (1988) 205 Cal.App.3d 938, 946; *Leader v. State of California* (1986) 182 Cal.App.3d 1079, 1089–1092; see also *People v. Cooks* (1983) 141 Cal.App.3d 224, 324–325; *People*

28.

*v. Reyes* (1976) 62 Cal.App.3d 53, 61–62.)  The open-the-door rule prevents witnesses from misleading the jury or misrepresenting facts.  (*People v. Robinson* (1997) 53 Cal.App.4th 270, 282–283; *People v. Shea* (1995) 39 Cal.App.4th 1257, 1267.)

The trial court's exercise of discretion to admit impeachment evidence, and its determination that evidence is more probative than prejudicial, will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10; *People v. Clark* (2011) 52 Cal.4th 856, 893.)

Defendant contends the court's initial decision to exclude the prior DUI cases as prejudicial was correct, and the court improperly reconsidered that ruling in the midst of his trial testimony.  Defendant argues there was nothing in his testimony which could have changed the court's initial analysis that the evidence was remote in time and constituted inadmissible propensity evidence.  Defendant contends his prior DUI cases were not relevant or probative to impeach any part of his trial testimony, and that he adequately explained that he was upset and confused because of the accident when Officer Grotto questioned him at the scene.  Defendant argues his assumption that Grotto was asking about Horne's alcohol consumption was reasonable since Grotto was trying to determine why Horne fell out of the truck.

To the contrary, the prior DUI investigations became relevant and probative impeachment evidence once defendant testified that he did not know he was being investigated for driving under the influence, that he did not understand the significance of the field sobriety tests, that he thought Officer Grotto's questions were about how much alcohol Horne had consumed that day, that he had no reason to clarify he only drank two beers, and that he did not understand he was being arrested until he was taken to the police station.  The evidence was not admitted to prove defendant had a disposition to drive while intoxicated or to impeach his credibility for moral turpitude, but it was

29.

probative to impeach his credibility based on the prosecution's undisputed offer of proof that he had gone through the same type of investigation in his previous DUI cases.

Defendant contends that aside from the relevance issues, his testimony did not change the court's initial prejudice analysis. When the court initially considered this evidence, however, it conducted the prejudice analysis based on the prosecution's argument the evidence relevant to prove defendant's gross negligence. At that time, the court's analysis properly focused on the potential for prejudice since defendant's prior DUI cases did not appear relevant for any other purpose.

At trial, however, defendant was faced with having to explain two damaging pieces of evidence: the tape-recording of the 911 call, when he said that he was going to do a "donut" and Horne "flew" out of the truck; and Officer Grotto's testimony that defendant said he consumed 20 beers. As to the telephone call, defendant testified he did not mean what he said to the 911 operator. He was upset when he made the call, and he only performed a slow and safe U-turn. As to his alcohol consumption, defendant did not limit his explanation to claiming that he was confused, upset, and distraught about his friend's serious injuries when he erroneously answered Grotto's question. Instead, defendant insisted he thought Grotto asked how much *Horne* had been drinking, and he did not understand Grotto was investigating whether *he* had been drinking, the significance of the field sobriety tests that were administered *to him*, and the nature of the questions about *his* physical and mental conditions. (See, e.g., *People v. Robinson*, *supra*, 53 Cal.App.4th at p. 283.)

At that point, the court properly reconsidered the prosecution's motion to introduce the prior DUI cases. Contrary to defendant's arguments, his trial testimony clearly changed the nature of the court's earlier analysis since the evidence was now relevant and probative for impeachment purposes, instead of being introduced to prove his character or disposition. (*People v. Lang*, *supra*, 49 Cal.3d at p. 1017.) The court properly weighed the tendency of the evidence to disprove defendant's trial assertions

against the possible prejudice.  The relevance and probative value of the evidence directly and strongly disproved defendant's claim that he did not understand that Grotto was investigating whether defendant was under the influence, particularly given the prosecution's offer of proof that he had been asked the same questions in the prior cases. As a result, the evidence was much more probative as impeachment evidence than when the prosecution initially requested its introduction.  While the court recognized the evidence still carried the potential for prejudice, the court did not abuse its discretion when it found the potential prejudice was outweighed by the probative value triggered by defendant's trial testimony.  (See, e.g., *People v. Senior* (1992) 3 Cal.App.4th 765, 778–779; *People v. Lankford* (1989) 210 Cal.App.3d 227, 240.)

Moreover, the prosecutor did not belabor defendant's prior DUI cases in closing argument, or claim the evidence was relevant to his character or propensity for drunk driving.  Instead, the prosecutor focused on the physical evidence in support of the case, particularly Officer Grotto's measurements at the scene, the pathologist's testimony that the violent injury to Horne's head was consistent with falling from a one or two-story building, defendant's blood-alcohol level, and defendant's inculpatory statements about doing the "donut" and his beer consumption.  Defense counsel countered with the contrary evidence from the defense experts, and argued defendant offered reasonable explanations for his alleged inculpatory statements.  The prosecutor only cited to defendant's prior DUI cases in rebuttal, when he asserted defendant was not credible when he claimed that he did not understand Officer Grotto's questions at the scene about how much he had been drinking.  The prosecutor argued:

> "And at no point did he ever say, wait a minute.  I only had two beers. Why are you investigating me for DUI?  And the explanation offered for that is the defendant's claim that he had no idea during this whole time, he had no idea what was going on.  He didn't realize he was being investigated for DUI.  Does that make sense?  Did you believe that?  *The defendant is someone who's been investigated for DUI twice before.  He's gone through this process*."  (Italics added.)

31.

Defendant contends the evidence was inadmissible because the court improperly permitted the prosecutor to impeach his trial testimony with a collateral matter. The court has discretion to exclude impeachment evidence that is collateral and has no relevance to the action. (*People v. Contreras* (2013) 58 Cal.4th 123, 152.) There was nothing collateral about impeaching defendant's testimony that he did not understand Officer Grotto asked him how much alcohol he had consumed that night.

Defendant complains the impeachment evidence should have been excluded because it did not consist of "convictions with their accordant indicia of reliability, but arrests and the facts related to those arrests," which are disfavored as impeachment evidence. Defendant is correct that generally, evidence of mere arrests which do not result in convictions is inadmissible because the evidence invariably suggest the defendant has a bad character. (*People v. Anderson* (1978) 20 Cal.3d 647, 650–651; *People v. Medina* (1995) 11 Cal.4th 694, 769; *People v. Lopez* (2005) 129 Cal.App.4th 1508, 1523.) In this case, however, defendant was actually convicted of offenses based upon some of these prior cases. (Cf. *People v. Williams* (2009) 170 Cal.App.4th 587, 610.) As we have already explained, defendant's own testimony undermined his previous assertion that he had no experience being investigated for driving under the influence, thus leading to the court's proper reconsideration of the issue.

Finally, defendant complains the prosecutor never authenticated the reports about the investigations conducted in the DUI cases before he cross-examined defendant, even though defense counsel made that objection. As we have explained, the court carefully reviewed defendant's record during pretrial motions, and defense counsel never challenged the prosecutor's offer of proof as to the existence and nature of the prior DUI cases. When the court reconsidered its initial ruling and held the evidence was admissible, defense counsel moved to call the investigating officers from the prior cases. The prosecutor explained the investigating officers had been under subpoena but he released them when the court granted defendant's pretrial objection to exclude the

evidence. The court advised defense counsel that he could make appropriate motions to introduce additional evidence after the prosecutor had completed his cross-examination. The court thus indicated that it would consider such evidence upon the appropriate defense motion. However, defense counsel never made such a motion, most likely to avoid exacerbating the inculpatory evidence which had already been introduced against defendant.

Even if the court's evidentiary ruling was erroneous, any error is harmless in this case. While defendant's credibility was an important issue, his trial testimony about his statements to the 911 operator and Officer Grotto still did not address the undisputed physical evidence in this case as to his drinking and driving. Indeed, the physical evidence was more consistent with his statements at the scene compared to his trial explanations. While the defense introduced experts to refute the EPAS results, there was no dispute about Grotto's description of defendant's appearance at the scene: Defendant's eyes were red and watery, his speech was slurred, and Grotto detected the distinct odor of alcohol. By his own trial admission, defendant had two beers and consumed Nyquil during the day. Defendant failed the field sobriety tests. Grotto's testimony about the dual tire tracks in the dirt was particularly damaging. Grotto was familiar with the signs of dirt displacement and acceleration, and saw evidence on the dirt shoulder consistent with an accelerated and abrupt turn, that the dual wheels were moving at a fast speed, the wheels were losing traction and spinning at a faster rate than the vehicle was moving. The defense experts attacked Grotto's report and claimed defendant's truck could not have performed a "donut" at a high rate of speed, but they failed to explain the dual tire tracks in the displaced dirt.

Finally, the defense did not introduce any evidence to undermine the pathologist's description of Horne's fatal head injuries. The pathologist explained the force required to cause Horne's brain injuries were roughly similar to falling out of a one- or two-story building and landing on the back of his head. The violent force required for these injuries

33.

further refuted defendant's claim that he was driving no more than seven miles per hour as he performed a safe and slow U-turn. Such evidence was thus consistent with defendant's initial description of the situation – that he was going to do a "donut" and Horne "flew" out of the truck, they had been drinking all day, and he had consumed 20 beers.

## II.     The court's causation instructions

Defendant contends the court committed prejudicial error by refusing to give his requested pinpoint instruction on Horne's conduct as an intervening, superseding cause, which would have absolved defendant from guilt. Defendant further contends the court's error was exacerbated because it overruled his objections to CALCRIM No. 620, a pattern instruction on causation, which defendant contends was confusing and inapplicable to the facts of this case. Defendant argues the court's errors were prejudicial because the instructions prevented the jury from finding that Horne's own conduct was the proximate cause of his death.

As we will explain, the entirety of the instructions correctly stated the applicable causation principles and addressed the defense theory, and the court did not commit error.

### A.  Causation

In order to address defendant's instructional issues, we begin with the relevant principles of causation. "In homicide cases, a 'cause of the death of [the decedent] is an act or omission that sets in motion a chain of events that produces as *a direct, natural and probable consequence* of the act or omission the death of [the decedent] and without which the death would not occur.' [Citation.]" (*People v. Cervantes* (2001) 26 Cal.4th 860, 866 (*Cervantes*), italics added.) "To be considered the proximate cause of the victim's death, the defendant's act must have been *a substantial factor contributing to the result*, rather than insignificant or merely theoretical. [Citations.]" (*People v. Briscoe* (2001) 92 Cal.App.4th 568, 583–584, fn. omitted, italics added; *People v. Jennings* (2010) 50 Cal.4th 616, 643.) The issue of causation is a factual question to be resolved

34.

by the jury.  (*Cervantes*, *supra*, 26 Cal.4th at p. 871; *People v. Brady* (2005) 129 Cal.App.4th 1314, 1326.)

"It is well established that a crime victim's contributory negligence is not a defense.  [Citations.]"  (*People v. Marlin* (2004) 124 Cal.App.4th 559, 569.)  A defendant may be " 'criminally liable for a result directly caused by his or her act, even though there is another contributing cause.' "  (*People v. Catlin* (2001) 26 Cal.4th 81, 156, quoting 1 Witkin & Epstein, Cal. Criminal Law (3d 2000) Elements, § 37, p. 243.)  "In criminal prosecutions, the contributing negligence of the victim or a third party does not relieve the criminal actor of liability, unless the victim's or third party's conduct was the *sole* or *superseding* cause of the death.  [Citations.]"  (*People v. Autry* (1995) 37 Cal.App.4th 351, 360, italics in original.)

"[I]t is only an unforeseeable intervening cause, an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause.  [Citations.]"  (*People v. Armitage* (1987) 194 Cal.App.3d 405, 420–421.)  "Facts attacking legal causation are only relevant if the defendant's act was *not* a substantial factor in producing the harm or injurious situation.  [Citation.]"  (*People v. Wattier* (1996) 51 Cal.App.4th 948, 953, italics in original.)  To constitute a sole or superseding cause, the victim's conduct must have been "*so unusual, abnormal, or extraordinary that it could not have been foreseen*.  [Citation.]"  (*People v. Schmies* (1996) 44 Cal.App.4th 38, 52, italics added.)  Absent such conduct, evidence the victim "may have shared responsibility or fault for the accident does nothing to exonerate [a] defendant for his role" and "is not relevant."  (*Id*. at p. 51.)

"[A] superseding cause must break the chain of causation *after* the defendant's act before he or she is relieved of criminal liability for the resulting harm."  (*People v. Wattier*, *supra*, 51 Cal.App.4th at p. 953, italics in original.)  As summarized by the California Supreme Court:

" 'In general, an "independent" intervening cause will absolve a defendant of criminal liability. [Citation.] However, in order to be "independent" the intervening cause must be "unforeseeable ... an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause." [Citation.] On the other hand, a "dependent" intervening cause will not relieve the defendant of criminal liability. "A defendant may be criminally liable for a result directly caused by his act even if there is another contributing cause. If an intervening cause is a normal and reasonably foreseeable result of defendant's original act the intervening act is 'dependent' and not a superseding cause, and will not relieve defendant of liability. [Citation.] '… The consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. … The precise consequence need not have been foreseen; it is enough that the defendant should have foreseen the possibility of some harm of the kind which might result from his act.' [Citation.]" [Citation.]' [Citations.]" (*Cervantes*, *supra*, 26 Cal.4th at p. 871.)

"The criminal law is thus clear that for liability to be found, the cause of the harm not only must be direct, but also not so remote as to fail to constitute the natural and probable consequence of the defendant's act." (*People v. Roberts* (1992) 2 Cal.4th 271, 319.)

With this background in mind, we turn to the court's instructions and defendant's objections to them, and will explain the jury was correctly instructed based on the above principles.

### B. **The court's instructions**

Defendant was charged with gross vehicular manslaughter while intoxicated with a prior conviction for driving under the influence (Pen. Code, § 191.5, subds. (a) & (d)). The court proposed to, and in fact did, instruct the jury on the charged offense with CALCRIM No. 590. The pattern instruction defined the elements of the charged offense and also included the following language on causation which closely tracks the legal principles set forth above:

"An act causes death if the death is *the direct, natural, and probable consequence* of the act and the death would not have happened without the act. *A natural and probable consequence* is one that a reasonable person

would know is likely to happen *if nothing unusual intervenes*. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.

"There may be more than one cause of death. An act causes death only if it is *a substantial factor* causing the death. A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that causes death." (CT 639, italics added)

This identical language on causation was also contained in the pattern instructions which the court used to instruct the jury on the lesser included offenses of vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (b); CALCRIM No. 591); gross vehicular manslaughter (Pen. Code, § 192, subd. (c)(1); CALCRIM No. 592); misdemeanor vehicular manslaughter (Pen. Code, § 192, subd. (c)(2); CALCRIM No. 593); driving under the influence (DUI) causing injury (Veh. Code, § 23153, subd. (a); CALCRIM No. 2100); and driving with a blood-alcohol content of 0.08 percent or greater causing injury (Veh. Code, § 23153, subd. (b); CALCRIM No. 2101). Defendant did not object to this causation language.

## C. Defense pinpoint instruction

Defendant's theory was that after they stopped on the side of Road 24, Horne got into the truck, buckled his seatbelt, and closed the passenger door. Defendant started to perform a safe and slow U-turn, and for some reason, Horne unbuckled his seatbelt, opened the door, and fell out. The defense speculated that either Horne was too drunk to realize what he was doing, or he was trying to adjust the safety belt. The defense argued defendant was not responsible for Horne's death; and Horne's own conduct was the intervening superseding cause of death to absolve defendant of culpability.

Based on this theory, defendant requested the following pinpoint instruction, based on *Cervantes*, that Horne's conduct was an independent intervening and superseding cause of his own death.

"In general, an 'independent' intervening cause will absolve a defendant of criminal liability. However, in order to be 'independent' the intervening cause must be '*unforeseeable … an extraordinary and*

37.

*abnormal occurrence*, which rises to the level of an exonerating, superseding cause.' [¶] *People v. Cervantes* (2001) 26 Cal.4th 860, 871." (Italics added.)

The court denied defendant's request for this pinpoint instruction and found the standard pattern instructions (quoted above) adequately covered the same causation principles.

### D. Defense objections to CALCRIM No. 620

In addition to requesting the pinpoint instruction, defense counsel objected to the court's decision to give CALCRIM No. 620, a pattern instruction on third-party causation which has several optional paragraphs. The court's proposed version of CALCRIM No. 620, which also closely tracked the above-quoted authorities on causation, stated:

"There may be more than one cause of death. An act causes death only if it is *a substantial factor* in causing the death. A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death.

"The failure of Marvin Horne or another person to use *reasonable care* may have contributed to the death. *But if the defendant's act was a substantial factor causing the death, then the defendant is legally responsible for the death even though Mr. Horne or another person may have failed to use reasonable care*.

"If you have a reasonable doubt whether the defendant's act caused the death, you must find him not guilty." (Italics added.)

Defense counsel objected to CALCRIM No. 620 and argued it only applied to situations where medical personnel are responsible for the victim's death after defendant injured the victim.[11] Defense counsel also objected to the second paragraph's definition of "substantial factor," and argued it contradicted the "natural and probable consequence" language in the instructions for the charged and lesser offenses. Counsel argued

---

[11] CALCRIM No. 620 includes alternate paragraphs which address the failure of medical staff to use reasonable care on an injured victim, and whether defendant's conduct was still a substantial factor of death.

38.

CALCRIM No. 620 prevented the jury from considering whether Horne's conduct was an intervening event to find defendant not guilty.

The prosecutor replied the instructions were not inconsistent because "if there's an intervening event then it's not a substantial factor. And [CALCRIM No.] 620 specifically has a parenthetical section where you're supposed to insert the name of a decedent." Defense counsel again objected that CALCRIM No. 620 only applied to medical personnel whose conduct results in the death of an already injured victim, but in this case "the decedent himself has caused his own death."

The court reviewed CALCRIM No. 620 and acknowledged there were alternate paragraphs which addressed the decedent's negligence, the negligence of medical personnel, and the death of an already vulnerable victim. However, the court used the pattern instruction's first paragraph about the decedent's own negligence because it was "specifically tailored for this instance. It is not talking about a third party. It's talking about the person that was deceased as a result of the actions. So I'm going to leave it."

Defense counsel again objected because the instructions would allow the jury to find Horne failed to use reasonable care but still find defendant guilty. The court replied that was the law.

### E. Analysis

Defendant contends the court committed prejudicial error by both refusing to give his pinpoint instruction on intervening and superseding cause, and rejecting his objections to CALCRIM No. 620. Defendant argues the court's errors were prejudicial because the jury was not correctly instructed on causation, and the two instructions prevented the jury from finding Horne's own conduct constituted an intervening, superseding cause that absolved defendant from guilt.

"The trial court must instruct, even in the absence of a request, on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case. [Citation.]" (*People v. Benavides* (2005) 35

39.

Cal.4th 69, 112.) " 'It is well established in California that the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction. [Citations.] "[T]he fact that the necessary elements of a jury charge are to be found in two instructions rather than in one instruction does not, in itself, make the charge prejudicial." [Citation.] "The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole." [Citation.]' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 328.) A claim of instructional error involves questions of law and is reviewed de novo. (*People v. Waidla* (2000) 22 Cal.4th 690, 733.)

A defendant has the right to an instruction that pinpoints the theory of the defense. (*People v. Roldan* (2005) 35 Cal.4th 646, 715, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421.) A pinpoint instruction explains the relationship between particular evidence and the elements of an offense. It is not required absent a defendant's request. (*People v. Bolden* (2002) 29 Cal.4th 515, 558.) However, the court need not give a pinpoint instruction if it "merely duplicates other instructions [citation] .…" (*Id.* at p. 558; *People v. Burney* (2009) 47 Cal.4th 203, 246.)

Defendant's proposed pinpoint instruction was based on language in *Cervantes* about reasonable foreseeability and intervening causes. As to these concepts, however, CALCRIM No. 240 has been found to correctly define dependent and intervening causes. (*People v. Fiu* (2008) 165 Cal.App.4th 360, 371–372; *People v. Temple* (1993) 19 Cal.App.4th 1750, 1754–1756.) CALCRIM No. 240 states:

> "An act [or omission] causes (injury/ <*insert other description*>) if the (injury/ <*insert other description*>) is *the direct, natural, and probable consequence* of the act [or omission] and the (injury/ <*insert other description*>) would not have happened without the act [or omission]. *A natural and probable consequence* is one that a reasonable person would know is likely to happen *if nothing unusual intervenes*. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence.

"*<Give if multiple potential causes.>*

"[There may be more than one cause of (injury/ *<insert other description>*).  An act [or omission] causes (injury/ *<insert other description>*), *only if it is a substantial factor* in causing the (injury/ *<insert other description>*).  A substantial factor is more than a trivial or remote factor.  However, it does not have to be the only factor that causes the (injury/ *<insert other description>*).]"

In this case, the court decided not to give CALCRIM No. 240 because it found "that language is covered in the underlying offenses."  The court was correct.  As explained above, the instructions on the charged and lesser included offenses included causation language *identical* to that contained in CALCRIM No. 240.  The causation language in the instructions on the substantive offenses was taken directly from CALCRIM No. 240 and "correctly indicates, in essence, that liability would not be cut off for an intervening act if the victim's death was nevertheless a 'direct, natural, and probable consequence' of defendant's original act. [Citation.]" (*People v. Fiu*, *supra*, 165 Cal.App.4th at p. 372.)  This definition of causation, "requiring an injury or death to be a direct, natural and probable consequence of a defendant's act necessarily refers to consequences that are reasonably foreseeable." (*Ibid*.)  Moreover, this language defines a "natural and probable consequence" as "one that a reasonable person would know is likely to happen if nothing unusual intervenes."  Further, while explaining that there may be more than one cause of death, the definition specifies that an act causes death "only if it is a substantial factor in causing … the death," and provides that a "substantial factor is more than a trivial or remote factor."  By instructing the jury with the identical language from CALCRIM No. 240, as contained in the instructions on the charged and lesser offenses, the court correctly instructed on the principles of causation, and independent intervening causation. (*People v. Fiu*, *supra*, 165 Cal.App.4th at pp. 371–372; *Cervantes*, *supra*, 26 Cal.4th at p. 866; *People v. Bland* (2002) 28 Cal.4th 313, 334–335, 338; *People v. Jennings*, *supra*, 50 Cal.4th at p. 670.)

As for CALCRIM No. 620, the instruction closely tracks the law on reasonable care and correctly stated that a defendant is criminally responsible if his or her conduct was a "substantial factor contributing to the result …." (*People v. Catlin* (2001) 26 Cal.4th 81, 155; *People v. Butler* (2010) 187 Cal.App.4th 998, 1009; *People v. Schmies*, *supra*, 44 Cal.App.4th at p. 49; *People v. Scola* (1976) 56 Cal.App.3d 723, 726.) In addition, CALCRIM No. 620 instructed the jury: "If you have a reasonable doubt whether the defendant's act caused the death, you must find him not guilty."

We thus conclude the court did not abuse its discretion when it declined to give defendant's pinpoint instruction on causation because it was duplicative of the definitions found in the instructions on the charged and lesser included offenses. We also conclude the court properly overruled defendant's objections to CALCRIM No. 620 because the instruction was not misleading as to causation, natural and probable consequences, and substantial factor. Based on the entirety of the instructions, the jury was correctly instructed to decide whether Horne's death was the natural and probable consequence of defendant's act, whether defendant's act was a substantial factor in causing Horne's death, or Horne's own conduct constituted something unusual that "intervened." (*People v. Bland*, *supra*, 28 Cal4.th at p. 338.) The jury was thus aware of the correct legal principles to find defendant's drunk driving was not a substantial factor and that Horne's own conduct was the intervening and superseding cause of his death.

Finally, a court's erroneous refusal to give a pinpoint instruction is reviewed for prejudice under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Earp* (1999) 20 Cal.4th 826, 886–887; *People v. Hughes* (2002) 27 Cal.4th 363, 361.) The court's error is harmless where defense counsel's argument pinpoints the defense, focuses the jury's attention on the issue, and the instructions given sufficiently cover the topic. (*People v. Gutierrez*, *supra*, 28 Cal.4th at p. 1144.)

Any instructional error in this case was harmless because the standard instructions conveyed the principles stated in defendant's proposed pinpoint instructions, and defense

counsel specifically addressed the issue in his closing argument. Defense counsel argued Horne took off his seatbelt and opened the passenger door, most likely because he "wasn't thinking as clearly as he should" because he was drunk. Horne may have tried to adjust the seatbelt, and he fell out of the truck because he was under the influence and lost his balance. Counsel focused the jury's attention on Horne's conduct as the intervening and superseding cause of his death:

> "[T]he law says if there's an intervening event that's unusual that causes the death, then [defendant] can't be responsible. And there's a whole bunch of other reasons we're going to go into why [defendant] is not responsible, but there was an intervening event. This U-turn started [and] an intervening event was Marvin Horne who was seriously intoxicated at that point in time. Maybe not for him because he drank a lot, but he was still intoxicated, decided there's something with my seatbelt, I want to undo it and I want to open the door. And as he did it, as people who are under the influence sometimes lose their balance, he fell out and unfortunately this terrible accident happened and he died.

> "*If you find this is an intervening act it doesn't matter what kind of care that [defendant] experienced for himself. Reasonable, unreasonable. It doesn't make any different because he caused his own death. Not [defendant], Marvin.*" (Italics added.)

Defense counsel cited the instructions and argued:

> "An act causes death if the death is a direct natural and probable consequence of the act and the death would have not happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.

> "Let's dissect that sentence. It says an act causes death if the death is a direct, natural, and probable consequence of the act. The act we have here is making a U-turn. Was Marvin's death the direct, natural, and probable consequence of the act. The act we have here is making a U-turn. If it is, no one should ever make a U-turn. *Or was it as it says, was it an unusual event that intervened. I would say it's highly unusual. You would not expect your passenger to take off their seatbelt and open their door and fall out when you're making a low speed turn.*" (Italics added.)

Defense counsel further argued:

43.

"… The People have to prove beyond a reasonable doubt that the act of making the U-turn in this situation was a substantial factor or the substantial factor. *If Marvin's intervention caused the act, then it's not a substantial factor. If [defendant] was driving as a normal person would drive, it's not a substantial factor. If [defendant] was making the turn at a low rate of speed, it's not a substantial factor.*

"So in this situation it basically comes out that the action by [defendant] of making this U-turn at the low rate of speed, stopping immediately, making sure that his passenger was seat belted in before they started, make *it's not a substantial factor. It's not even a factor, quite honestly. It's not even a factor at all in Marvin's death. Marvin's death was caused by Marvin and no one else.*" (Italics added.)

Defense counsel skillfully placed the issue of Horne's purported intervening act before the jury and argued that Horne's conduct was the only substantial factor which caused his own death. The jury was clearly aware of the defense theory and it could have found defendant not guilty based on the legally correct instructions and the defense argument. Instead, the jury found defendant guilty of the lesser included offense of vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (b)).

## III.     The instructions on lesser included offenses

Defendant next contends the court erroneously instructed the jury on how it could consider the greater and lesser included offenses. Defendant complains that CALCRIM No. 3517, on the deliberations for lesser included offenses, merely advised the jury on how to fill in the relevant verdict forms, and failed to comply with the requirements of *People v. Dewberry* (1959) 51 Cal.2d 548 (*Dewberry*) on reasonable doubt and how to choose between the greater and lesser offenses. Defendant acknowledges he was found not guilty of the greater offense of gross vehicular manslaughter while intoxicated, and guilty of the lesser offense of vehicular manslaughter while intoxicated, but argues the instructions prevented the jury from considering the other lesser included offenses, particularly vehicular manslaughter.

Defendant's *Dewberry* argument is meritless. *Dewberry* held that "when the evidence is sufficient to support a finding of guilt of both the offense charged and a lesser

44.

included offense, the jury must be instructed that if they entertain a reasonable doubt as to which offense has been committed, they must find the defendant guilty only of the lesser offense. [Citations.]" (*Dewberry*, *supra*, 51 Cal.2d at p. 555.) "The failure of the trial court [in *Dewberry*] to instruct on the effect of a reasonable doubt as between any of the included offenses, when it had instructed as to the effect of such doubt as between the two highest offenses, and as between the lowest offense and justifiable homicide, left the instructions with the clearly erroneous implication that the rule requiring a finding of guilt of the lesser offense applied only as between first and second degree murder." (*Id.* at p. 557.) "It has since been held that in any case involving a lesser included offense, the trial court has a duty to give a *Dewberry* instruction sua sponte. [Citations.]" (*People v. Crone* (1997) 54 Cal.App.4th 71, 76.)

It is well-settled that *Dewberry* is satisfied if the court gives CALCRIM No. 3517 (the current version of CALJIC No. 17.10) and the pattern instruction on reasonable doubt. (*People v. Crone*, *supra*, 54 Cal.App.4th at p. 76; *People v. Barajas* (2004) 120 Cal.App.4th 787, 793; *People v. Gonzalez* (1983) 141 Cal.App.3d 786, 794, fn. 8, disapproved on other grounds in *People v. Kurtzman* (1988) 46 Cal.3d 322, 330; *People v. St. Germain* (1982) 138 Cal.App.3d 507, 521–522.) In this case, the jury received CALCRIM No. 220, the standard instruction on reasonable doubt, and CALCRIM No. 3517, and these instructions complied with *Dewberry*. There was no error.

## IV. The court's imposition of the upper term

Defendant's final issue is that the court abused its discretion when it imposed the upper term for his conviction of the lesser included offense of vehicular manslaughter while intoxicated. Defendant argues the court improperly cited to inaccurate aggravating circumstances, including the breakdown of plea negotiations prior to the trial in this case, and failed to give appropriate consideration to mitigating factors. Defendant's arguments are meritless.

45.

## A. <u>Prior plea negotiations</u>

One of defendant's primary attacks upon the court's sentence is that the court improperly and inaccurately cited the pretrial plea negotiations as an aggravating factor when it selected the upper term. We must thus begin with the pretrial proceedings in order to refute these contentions below.

On February 16, 2008, defendant was arrested at the scene. He posted bail the next day, and remained released on bail until he was convicted by the jury in this case.

On April 18, 2008, the complaint was filed which charged defendant with gross vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (a)), and two other offenses. Defendant pleaded not guilty.

On June 28, 2008, just four months after Horne's death, defendant was arrested and later convicted of misdemeanor driving on a suspended or revoked license in Kerman (Veh. Code, § 14601.1, subd. (a)) and placed on probation. He remained on bail.

On July 28, 2009, prior to the preliminary hearing being held on Horne's death, defendant entered into a negotiated disposition with the prosecution, and pleaded no contest to the lesser offense of vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (b)), on condition that the four-year prison sentence would be stayed, and he would be placed on probation and ordered to attend an in-patient treatment program.

An attorney for Horne's family appeared at the plea hearing and strenuously objected to the proposed disposition. He requested the preparation of a probation report, the opportunity to object to the plea at the sentencing hearing, and that defendant should receive a prison sentence. He advised the court that defendant had prior DUI convictions that had not been considered. Defendant's attorney responded that Horne had prior DUI convictions, he lived a very reckless life, and he never wore his seatbelt.

The court accepted defendant's plea and referred the matter to the probation department. The court stated that the parties may have reached an agreement, but it

would review the probation report at the sentencing hearing, consider any objections, and determine "whether that agreement as it stands is either accepted or rejected."

The probation report prepared for the plea agreement (the 2009 report) recommended a four-year suspended sentence, five years of felony probation, 180 days in jail, and a one-year inpatient substance abuse program. The attorney for the victim's family filed a lengthy statement in opposition, discussed defendant's prior DUI offenses which had not been listed in the probation report, and argued defendant failed to take responsibility and he should receive a prison sentence.

On October 20, 2009, the court held the sentencing hearing for the plea. Defense counsel asserted the plea agreement was appropriate because there were factual disputes about the cause of the accident, and there was evidence that Horne may have been responsible for his own death. Horne's family again objected to the plea and probation, and argued defendant should serve time.

The court was concerned about defendant's prior history of drunk driving arrests and convictions. The court imposed the upper term of four years, and suspended the sentence pending defendant's successful completion of probation. The terms and conditions of probation included defendant's service of 180 days in jail upon his immediate remand, and completion of an inpatient substance abuse program.

Defense counsel immediately objected to the court's imposition of jail time as a condition of probation, and stated the plea agreement did not include any custodial time in either jail or prison. The prosecutor agreed with defense counsel's understanding of the negotiated disposition. The attorney for Horne's family complained it would be an insult to the victim for defendant to avoid serving jail time for Horne's death. The court noted the plea agreement provided for no prison time, but that did not foreclose time in county jail. Defense counsel again objected to any custodial time.

47.

The court rejected the plea agreement because of the dispute over the terms and defendant's refusal to serve local time as part of the plea. The court allowed defendant to withdraw his no contest plea, and set the matter for a preliminary hearing.

## B. Defendant's conviction

Defendant remained on bail after the plea was withdrawn. On August 21, 2011, while awaiting trial, defendant was convicted of another misdemeanor violation of driving on a suspended or revoked license in Tuolumne County (Veh. Code, § 14601.1, subd. (b)), and again placed on probation. He remained on bail.

On January 26, 2012, defendant's jury trial began in this case. As previously explained, on February 23, 2012, defendant was found guilty of the lesser included offense of vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (b)).

## C. The sentencing hearing

On October 26, 2012, the court conducted the sentencing hearing in this case. The court advised the parties that it had reviewed the updated probation report (the 2012 report), which recommended imposition of the upper term of four years.

According to the probation report, defendant (born 1974) was convicted in 1995 of misdemeanor driving on a suspended or revoked license (Veh. Code, § 14601.2, subd. (a)), and placed on probation. In 1996, he was convicted of misdemeanor criminal threats (Pen. Code, § 422), and placed on probation. In 1996, he was convicted of misdemeanor violations of driving with a blood-alcohol level of 0.08 percent or more (Veh. Code, § 23152, subd. (b)), and driving on a suspended or revoked license (Veh. Code, § 14601.2, subd. (a)), and placed on probation. As we have already noted, he was convicted of two more misdemeanor offenses for driving with a suspended or revoked license in 2008 and 2011, while on bail in this case.

The probation report cited one mitigating circumstance: Defendant's prior performance on probation in 1996 was satisfactory. It found aggravating circumstances that defendant had a prior criminal record, his performance on probation in 1995 was not

satisfactory because he committed another offense, and he committed two more offenses while awaiting trial in this case. The court also reviewed letters and statements offered by the family and friends of both defendant and Horne.

The court stated this case involved "a horrendous offense" and noted defendant's prior DUI convictions. The court was also troubled that he committed two additional offenses for driving with a suspended or a revoked license while he was on bail in this case.

The court was inclined to impose the upper term based on its evaluation of the aggravating and mitigating factors, but believed it was "very close" between the upper and middle term. The prosecutor and Horne's father asked the court to impose the upper term because of defendant's lack of remorse, prior criminal history, and commission of additional offenses on bail.

Defense counsel discussed the prior plea negotiations and focused on the recommendation in the 2009 probation report for a suspended sentence and probation. Defense counsel argued nothing had changed since the probation department's original recommendation, except for the fact of the instant jury trial. However, defense counsel conceded defendant incurred two "non-alcohol related" violations for driving with a suspended or revoked license while he was on bail during the pretrial period. Defense counsel argued the court should follow the 2009 probation recommendation, and complained the jury trial occurred "not at [defendant's] request but because … the deal didn't go through."

The court interjected the plea did not go through because the court found the recommended sentence for probation was not appropriate, defendant rejected a prison term, and the 2009 probation report did not mention defendant's prior DUI offenses.[12]

---

[12] The 2009 probation report stated that defendant had an insignificant prior record, and his performance on a 1996 grant of misdemeanor probation was satisfactory.

Defense counsel replied that defendant had not incurred any convictions since 1996, except for driving without a valid license. Counsel explained defendant accepted responsibility for Horne's death because his insurance company settled a civil claim filed by Horne's family, and paid "a million dollars to the estate."[13] Counsel argued the mitigated term was appropriate, but requested the middle term of two years since defendant's actions resulted in Horne's death.

### D. **The court's ruling**

The court found the aggravating factors outweighed the mitigating factors, and imposed the upper term of four years. The court described the case as difficult and a tragedy and stated it would apply the law and "both sides will need to figure out a way to live with that."

The court was concerned about several inconsistent statements made by defendant in the 2009 and 2012 probation reports. In 2009, defendant told the probation officer that Horne did not put on his seatbelt and fell out of the vehicle. At trial, however, defendant repeatedly testified under oath that he checked to make sure Horne put on his seatbelt. "So there appears to be a change. I think the 2009 statement is probably more accurate than the 2012 [statement]. I don't know why he would change his perception of the facts, but he did."[14]

The court also noted that in the 2009 probation report, defendant said he last drank alcohol in May 2009 and admitted drug use. In the 2012 report, defendant said he had

_____

In its opposition to the 2009 plea proceedings, Horne's family advised the court about defendant's prior DUI convictions which were not listed in the probation report.

[13] Horne's father disagreed with defendant's claim of taking responsibility, and said he had to hire an attorney and file a lawsuit in order to obtain a settlement.

[14] In the 2009 probation report, defendant stated Horne did not put on his seatbelt.

not consumed any alcohol or drugs since the offense occurred in February 2008. The court was concerned about these "substantially different" statements.[15]

The court further noted that in 2009, defendant told the probation officer that "it wasn't a hundred percent his fault. In the new report of 2012 he says it totally wasn't his fault. So in the earlier report he was indicating some culpability. In the new report he was indicating no culpability, that it was just an accident."[16]

The court was also concerned that while defendant was released on bail prior to the trial, "he went out and violated the Vehicle Code [by] driving with a vehicle with a suspended license, not once, but twice during the interim ...."

The court extensively explained the reasons it decided to impose the upper term.[17]

> "So those are some concerns that the Court has. Again, this is a horrific matter. Because of the nature of the offense and the damage and the injury that was caused, and the way that it occurred, the facts of it, the Court feels this is not an appropriate case for probation. In determining the appropriate term to be imposed the Court's looked at the aggravated circumstances as listed in the Probation Department report. Specifically, defendant's prior convictions are numerous. Most importantly, the DUI conviction. And there was some discussion that he had a prior conviction before that conviction, I believe it was a juvenile conviction [*sic*]. His prior performance on the 1995 two-year grant of bench probation was unsatisfactory. He violated it. Two separate occasions he committed new offenses while he was on probation in those matters.

---

[15] In the 2009 probation report, defendant stated he regularly consumed alcohol, marijuana and methamphetamine, and he last used drugs in March 2009 and alcohol in May 2009. In the 2012 probation report, defendant stated he never used drugs, and he had not consumed alcohol since the incident occurred in February 2008.

[16] In the 2009 probation report, defendant attributed blame for the accident on Horne for " 'being drunk,' " and said he was not "100% responsible for the accident." In the 2012 report, defendant said it was an accident, it was not his fault, and he was not legally responsible for Horne's death.

[17] We feel compelled to quote the entirety of the court's decision, given defendant's unpersuasive arguments that the court placed undue weight on the aggravating factors, misapplied the mitigating factors, and punished defendant for exercising his right to trial.

"The circumstances in mitigation. Defendant's prior performance on the [two 1996] grants of probation appear to have been satisfactory. Additional, the defendant did have insurance in this matter. Restitution through a civil settlement has, at least, in part, been provided. *Defendant voluntarily acknowledged wrongdoing before arrest or at an early stage of the criminal proceedings. I don't – I'm going to discount that as a circumstance in mitigation. This matter did go to a jury trial. That offer to plea[d] wasn't until roughly a year and a half later*.

"So in evaluating those factors, the Court finds that based upon specifically the fact that these prior violations, his prior record involved DUIs, involved alcohol, he knew what the dangers of driving under the influence were, the Court does find that the aggravating circumstances do outweigh the circumstances in mitigation. So the Court believes that the appropriate term is the aggravated term on that basis." (Italics added.)

### E. Analysis

The court's sentencing decision is reviewed for an abuse of discretion. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.) A single factor may support a sentencing choice. (*People v. Quintanilla* (2009) 170 Cal.App.4th 406, 413.) On appeal, " '[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve the legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.' [Citation.] Concomitantly, '[a] decision will not be reversed merely because reasonable people might disagree. "An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge." [Citations.]' [Citation.]" (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977–978.)

Defendant contends the court abused its discretion by citing to his prior convictions as aggravating circumstances even though the last offense occurred 12 years earlier, and the offenses were for driving with a suspended license, misdemeanor driving under the influence, and misdemeanor making a threat. Defendant argues the prior offenses showed a period of aberrant behavior when he was 21 and 22 years old, and his alleged poor performance on probation occurred during the same period.

52.

Defendant also complains the court failed to give appropriate weight to the mitigating circumstances of his clean record since 1996, and his civil settlement with Horne's family. Defendant contends the court improperly rejected the mitigating factor of his earlier acknowledgment of wrongdoing simply because the plea negotiations broke down, the court rejected the plea bargain, and defendant claimed his constitutional right to a jury trial. Defendant argues the court's consideration of the prior plea hearings violated his constitutional right to have a jury trial.

The court did not abuse its discretion. Defendant's repeated claim that he accepted responsibility at an early stage is undermined by his inconsistent statements to the probation department and at trial, which alternated between admitting responsibility, blaming the victim, and minimizing and/or denying any misconduct on his own behalf. The court also properly considered his inconsistent statements about his alcohol and drug use. The court did not abuse its discretion by considering his prior record because of the DUI convictions in light of what happened in this case. The court also did not abuse its discretion by considering defendant's offenses during the pretrial period when he was on bail in his case since he continued to drive despite having the suspending or revoked license, even as he faced felony charges for causing the death of Horne for driving while intoxicated. The existence of any one of these factors would have supported the court's decision to impose the upper term.

As for the plea negotiations, defendant entered into the no contest plea on the specific condition that he would not receive any time in custody. The court rejected the plea agreement for probation once it learned about defendant's record. When the sentencing court referred to the prior plea negotiations, it was not penalizing defendant for requesting a jury trial on the charged offenses, but noting that his alleged acceptance of responsibility was only based on the agreement to receive probation and his repeated insistence that the victim was to blame for his own death.

We find the court did not abuse its discretion when it imposed the upper term in this case.

## **<u>DISPOSITION</u>**

The judgment is affirmed.

_____

Poochigian, Acting P.J.

WE CONCUR:


_____

Franson, J.


_____

Peña, J.